# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 51 | **DATE** | 10/24/2001 |
| **CASE TITLE** | Nav-Aids, Ltd. vs. Nav-Aids USA, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Plaintiff's motion for partial summary judgment (16-1) and for entry of preliminary injunction (16-2) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

courtroom deputy's initials: GL

Date/time received in central Clerk's Office

number of notices

date docketed: OCT 25 2001

docketing deputy initials

date mailed notice: 10/24/2001

mailing deputy initials: GL

Document Number: 27

01 OCT 25 AM 9:03

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NAV-AIDS LTD.,  )
A Quebec Corporation  )
  )
    Plaintiff-Counterdefendant,  )
  )
v.  )  Case No. 01 C 0051
  )
NAV-AIDS USA, INC.,  )
An Illinois Corporation  )
  )
    Defendant-counterplaintiff.  )
  )

DOCKETED
OCT 25 2001

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, Chief Judge:

    Plaintiff, Nav-Aids, Ltd. ("LTD"), brought a complaint against defendant Nav-Aids USA, Inc. ("USA"), pursuant to 28 U.S.C. §§ 1331, 1332(a)(2) and 1338 and the LanhamTrademark Act, 15 U.S.C. § 1051, et. seq. Before us now is LTD's Combined Motion for Partial Summary Judgment and for Entry of Preliminary Injunction. LTD seeks partial summary judgment on Count I of its Complaint (breach of contract). Additionally, LTD requests this court to enter a preliminary injunction enjoining USA from (1) using LTD's product designation system, (2) misrepresenting in any way that products, goods, and services not approved or authorized by LTD are approved and authorized by LTD, and (3) using the "nav-aidsltd.com" and "navaidsltd.com" domain names. For the reasons set forth below, we grant LTD's motion for partial summary judgment and grant LTD's motion for a preliminary injunction.



## BACKGROUND[1]

LTD, incorporated and with its principal place in business in Quebec, Canada, designs, manufactures and sells ground support equipment to aircraft manufacturing firms, airlines, service providers and the United States military. USA, a Delaware corporation with its principal place of business in Illinois, is engaged in the business of distributing, *inter alia*, ground support equipment that it obtains from various manufacturers and wholesalers, which it in turn sells to aircraft manufacturing firms, airlines, service providers and the United States military. For many years, USA was a distributor of LTD products pursuant to an oral distributorship agreement, whereby USA would receive orders from end-users for LTD equipment and purchase that equipment from LTD for resale directly to the end-users. USA offered to purchase LTD's equipment by submitting purchase orders to LTD. LTD accepted USA's offers by shipping the requested equipment in response to each purchase order it received. At the time the equipment was shipped, LTD transmitted invoices for each purchase order, which contained various terms and conditions governing the parties' relationship. In October 2000, LTD terminated the distributorship with USA.

### A. Breach of Contract Claim

Prior to the termination of the parties' distributorship, USA submitted a series of purchase orders to LTD. In response, LTD manufactured and delivered equipment to USA. LTD transmitted invoices for each purchase order and otherwise fully performed its contractual obligations. The total amount of the invoices for this equipment is $225,388.40. USA, however, has refused to tender payment to LTD. Also prior to the termination of the parties' distributorship, LTD failed to fill 18 of USA's orders. The parties agree that USA's profit on these orders was to be

---

[1]The following facts, unless otherwise specified, are culled from the parties' Local Rule 56.1 Statement.

$15,244.00. Moreover, LTD has received and cashed $3,963 in payments intended for USA (*after* setting off a $815.00 payment which was mistakenly received and cashed by USA, but intended for LTD). Finally, USA contends that it is unknown to what extent other set-offs might be necessary as a result of LTD cashing checks intended for USA. These monies are the basis of the present motion for summary judgment on the breach of contract claim.

## B. Product Designation System

LTD has developed and continues to use a product-designation system by which it identifies each of its products according to a unique product code consisting of a meaningful series of alpha-numeric characters. For example,

> the pitot test adapter that LTD sells for the Boeing 747-400 aircraft is identified by the following designation: PSS44600M2-3-4-4. The "PSS" designates a pitot dual static test adapter, the "44600" designates that the adapter is for this particular aircraft, the "M2" signifies the adapter is suitable for high temperature use and the "3-4-4" refers to the fitting sizes for the hose.

(LTD's Memo, p. 3). LTD contends that this product-designation system has become associated with LTD and its parts and that consumers associate the system with LTD. USA, apparently with the approval of LTD throughout the distributorship, used an identical product identification system on its products. For its part, USA contends that, since the distributorship agreement between the parties was terminated, it has changed its product designation system so that it is no longer identical to LTD's. Specifically, USA has added letter prefixes to each product number that, it says, clearly identify those products as originating with USA – "It is very simple – USA part numbers begin with these letter prefixes and LTD part numbers do not." (USA's Memo, p. 3).[2] In addition, LTD alleges that USA inappropriately uses pictures of LTD products on its website (a

---

[2]The parties also dispute the prevalence and impact of USA part numbers that do not contain the letter prefixes: namely, (1) those products that were sold based on a purchase order or confirmation that did not contain the letter prefix (which USA contends is very rare and the result of clerical error) and (2) those products sold to the military.

3

practice USA contends has ceased). USA's use of the product designation system is the basis for LTD's request for a preliminary injunction preventing such use on the ground that it constitutes unfair competition and deceptive trade practices under the Lanham Act and Illinois law.

## C. Domain names

Finally, LTD seeks a preliminary injunction preventing USA from using the domain names "nav-aidsltd.com" and "navaidsltd.com." Such use prevents LTD from using those domain names for its own website. LTD contends that such use by USA is a violation of Section 43(d) of the Lanham Act, also known as the Anticybersquatting Consumer Protection Act.

## ANALYSIS

### A. Breach of Contract Claim

LTD seeks partial summary judgment on its breach of contract claim (Count I) against USA. For the reasons set forth below, we grant partial summary judgment as to Count I.

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, we must evaluate the admissible evidence in the light most favorable to the nonmoving party. *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). The party opposing the motion for summary judgment must affirmatively demonstrate that there is a genuine issue of material fact that requires trial. Fed.R.Civ.P. 56(e); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, if the evidence is merely colorable, or is not sufficiently probative, the court may grant summary judgment. *Id.* at 249-50.

In order to prevail on its breach of contract claim, LTD must establish (1) the existence of a valid contract; (2) full performance by LTD; (3) the fact of USA's breach; and (4) the existence of damages resulting from that breach. *City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F.Supp. 1288, 1299-1300 (N.D. Ill. 1993). The parties have no dispute over the first three elements of this test. First, there is no dispute that there was a valid oral distributorship agreement between the parties.[3] (Rule 56 Statement, ¶5). Second, there is no dispute that LTD fully performed its obligations under the contract. (Rule 56 Statement, ¶9). Third, there is no dispute on the fact of USA's breach, that is, its failure to pay for the items manufactured and shipped by LTD. (Rule 56 Statement, ¶10). All that remains, therefore, is a dispute as to the amount of damages payable as a result of USA's breach.

The *existence* of damages is not in dispute. There is no question that USA owes some sum of money to LTD for items previously manufactured and shipped. Rather, USA contends that the *amount* of damages is in dispute and that such dispute renders summary judgment inappropriate at this stage in the proceedings. (USA's Memo, p. 5-6). The confusion over amount stems from the fact that each party is holding money that it freely acknowledges belongs to the other party. Moreover, apparently as a result of some confusion just after the termination of the parties' distributorship agreement, some customers tendered payment to LTD that was meant for USA, and some customers tendered payment to USA that was meant for LTD. For the most part, the parties agree as to the amounts in question.

The parties agree that the amount owed to LTD by USA for equipment shipped and not paid for is $225,388.40. (Rule 56 Statement, ¶10). The parties agree that USA's lost profit for the

---

[3]The parties dispute how long the agreement was in place. LTD claims it was in effect for "several" years. USA says that, on the contrary, the agreement had been in place for 19 years, and 19 years is far more than merely "several years." The parties' fixation on the amount of time the agreement has been in effect is not relevant, however. The existence of a valid contract is all that matters for purposes of the breach analysis.

18 orders that LTD failed to ship prior to the termination of the parties' agreement was $15,244.00. (Rule 56 Statement, ¶11). The parties further agree that USA is entitled to a credit of $3,963 for a payment that was mistakenly sent to LTD but was meant for USA (after setting off an $815 payment which, the parties agree, was mistakenly sent to USA but meant for LTD). (Rule 56 Statement, ¶12).

The only area of disagreement is from USA's Response to LTD's Rule 56 Statement. In short, USA contends that "it is unknown whether other set-offs are available to USA as a result of LTD cashing other checks intended for USA." (USA's Response to Rule 56 Statement, ¶¶10-12). USA contends that such uncertainty is itself reason to deny summary judgment until further discovery can yield a more accurate accounting. LTD argues that "such speculation cannot be a basis for precluding the entry of summary judgment." (Reply, p.2). Additionally, LTD argues that further discovery on the issue would not be efficacious. Customers that didn't pay their amount due to USA, if any, would be plainly apparent from USA's own accounts receivable. We agree.

In order to avoid entry of summary judgment, USA must "set forth specific facts sufficient to raise a genuine issue for trial." *Weicherding v. Riegel*, 160 F.3d 1139, 1142 (7th Cir. 1998)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The Seventh Circuit has specifically noted that such facts presented must be "more than mere speculation or conjecture." *Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir. 1999). USA has not met this burden. As such, we grant LTD's motion for partial summary judgment on Count I of the Complaint in the amount of $206,181.40, plus prejudgment interest from the due dates of the invoices.[4]

---

[4] Under the standard outline in *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436-438 (7th Cir. 1989), prejudgment interest is hereby awarded at the prime rate and compounded annually. This ruling recognizes that "[m]oney has a time value, and prejudgment interest is therefore necessary . . . to compensate a plaintiff fully for a loss suffered." *Partington v. Broyhill Furniture Indus.*, 999 F.2d 269, 274 (7th Cir. 1993).

## B. Preliminary Injunction

In order to obtain a preliminary injunction, the moving party must show that its case has some likelihood of success on the merits, that no adequate remedy at law exists, and that it will suffer irreparable harm if the order is not granted. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d, 891, 895 (7th Cir.2001).[5] If these three conditions are met, a court must then balance the hardships that the moving party will suffer if relief is not granted against those that the nonmoving party will suffer if relief is granted. *Id.* A court must also consider the public interest, that is, the interest of non-parties, in deciding a motion for a preliminary injunction. *Id.* Finally, a court "weighs all of these factors, 'sitting as would a chancellor in equity,' when it decides whether to grant the injunction." *Id.* (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992)).

### 1. Use of the Product Designation System

LTD moves for a preliminary injunction preventing USA from using the part numbers of LTD products.[6] In short, LTD contends that its product designation system is protected under the Lanham Act, the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFDBPA"), and the Illinois Uniform Deceptive Trade Practices Act ("UDTPA").

#### a. Likelihood of Success

Count II of LTD's Complaint states claims for false designation of origin under Section 43(a) of the Lanham Act. See 15 U.S.C. § 1125(a). In order to prevail under Section 43(a) of the Lanham Act, LTD must establish "(1) that it has a protectible trademark, and (2) a likelihood of confusion as to the origin of the defendant's product." *International Kennel Club of Chicago, Inc.*

---

[5] The standards governing temporary restraining orders and preliminary injunctions are identical. *Charter Nat'l Bank and Trust v. Charter One Fin., Inc.*, 2001 WL 527404 (N.D. Ill. 2001).

[6] LTD also seeks an injunction preventing USA's alleged use of a pictured LTD product on the "About Us" page of USA's website. Without arguing as to the merits of LTD's allegations, USA contends that it has removed the offending picture. (USA's Memo, p. 11). Assuming this to be the case, LTD's motion regarding the picture is moot. Should USA's assertion turn out to be false, we will entertain a further motion from LTD on this matter and consider sanctions against USA.

v. *Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988) (internal citations omitted). To establish a likelihood of success, LTD must only establish that it has a "better than negligible" chance of prevailing on the merits. *Ty, Inc.*, 846 F.2d at 1084. We find that LTD has met this burden.

First, LTD must establish that its product numbering system is a protectible mark. To be protectible, LTD must demonstrate that the numbering system is arbitrary or suggestive, or in the alternative, that it is descriptive and has acquired secondary meaning. *Kennel Club*, 846 F.2d at 1079. As described above, the product numbering system is meant to clearly identify each product in terms of what aircraft it is for, the product type, and the fitting specifications. In this way, it is clearly a descriptive, not an arbitrary, mark. LTD makes much of the argument that one element of the product designation – the five digit number corresponding to the type of aircraft – is arbitrary. However, USA correctly analogizes to the facts presented in *Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836 (4th Cir. 1990). In *Dayton*, the parties were using 39 different three-letter product designations ("VJR," "VVX," etc.) to distinguish between various tool and die presses. The letters corresponded to the grade or class of the punch, the specific function of the punch, and the shape of the tip of the punch, respectively. *Id.* at 839. The Court affirmed the District Court's ruling that the marks were descriptive. *Id.* Here, using "22300" to designate the Boeing 737 is no different than using the letter "V" to describe the grade of a punch or the letter "J" to describe the function of a punch. The product number as a whole is descriptive mark. As such, it requires secondary meaning to be protectible as a trademark.

Secondary meaning "denotes an association in the mind of the consumer between the trade dress of a product and a particular producer." *Vaughan Mfg. Co. v. Brikam Int'l., Inc.*, 814 F.2d 346, 348 (7th Cir. 1987) (internal citations omitted). Factors the court considers in establishing the presence of secondary meaning include "[t]he amount and manner of advertising, volume of sales, the length and manner of use, direct consumer testimony, and consumer surveys." *Gimix,*

*Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 907 (7th Cir. 1983) (quoting *Union Carbide Corp. v. Ever-ready, Inc.*, 531 F.2d 366, 380 (7th Cir.), *cert. denied*, 429 U.S. 830 (1976)). "Consumer testimony and consumer surveys are the only direct evidence on this question ... [t]he other factors are relevant in a more circumstantial fashion." *Id.* Here, LTD relies primarily on affidavits from its customers who testify that LTD's product numbering system identifies LTD's products and is associated in their minds solely with LTD. Such a showing, USA correctly points out, might not be sufficient to establish secondary meaning if this issue were to be judged on its merits. In particular, USA argues that the affidavits provided by LTD are not from end users. Rather, USA argues that LTD's affiants are merely distributors of LTD's products, and as such, they are direct competitors of USA. Notwithstanding this argument however, all that is required at the preliminary injunction phase of these proceedings is that LTD demonstrate a "better than negligible" chance of succeeding on the merits. *Ty, Inc.*, 846 F.2d at 1084. LTD has successfully met this greatly reduced burden and we find that its product designation system has secondary meaning and, as such, is a protectible mark.

The next prong in determining LTD's likelihood of success is an inquiry into the likelihood of confusion as to the origin of the protected marks. At this point, it is best to split our analysis of this issue into two parts: (1) the likelihood of confusion resulting if USA uses product designations identical to LTD's on its products; and (2) the likelihood of confusion if USA uses product designations similar to LTD's but with added letter prefixes. Because each yields a different result, they will be examined in turn.

1. Confusion of identical marks

Although no one factor is considered decisive, the Seventh Circuit has noted that "the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important considerations" when determining likelihood of confusion. *Ely Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000). In this prong of the analysis, the similarity of

the marks is not in question – they are, in fact, identical. Moreover, LTD points out *actual* confusion between the parties' products. For example, B.F. Goodrich returned to LTD a replacement batch of seals used in a test adapter that it purchased from USA. Apparently after seeing the LTD part number on the seals, B.F. Goodrich mistakenly assumed the product came from LTD. (LTD Memo, p. 7). This evidence of actual confusion, combined with the fact that the marks are identical in nature, is sufficient to find that LTD has a better than negligible chance of establishing a likelihood of confusion when the marks are identical.

2. Confusion of similar, but not identical, marks

According to USA, all USA products, except those sold to the military and except where as the result of a typographic error, are preceded by a letter prefix.[7] USA contends that such a prefix is sufficient to distinguish its products from LTD's and negates any likelihood of confusion between the marks. We agree. Using the same three important factors outline by *Ely Lilly & Co.* above, it is clear that (1) the marks are not identical (though they are similar); (2) USA, despite LTD's contention, does not have bad intent; and (3) there is no evidence of actual confusion.

First, it is clear that the marks are no longer identical. LTD, however, correctly points out that "absolute identity is not necessary for infringement; all that is necessary is enough similarity between the marks to confuse consumers." *Washington Speakers Bureau, Inc. v. Leading Auths., Inc.*, 33 F.Supp.2d 488, 497 (E.D. Va. 1999), *aff'd*, 217 F.3d 843 (4th Cir. 2000); *Keller Prods. v. Rubber Linings Corp.*, 213 F.2d 382, 387 (7th Cir. 1954) (trademark infringement "does not depend upon the use of identical words"). Despite this fact, the dissimilarity of the marks remains a probative issue for the likelihood of confusion analysis. *Ely Lilly & Co.*, 233 F.3d at 462. USA's inclusion of the letter prefix before a part number does add a new element to the part number that

---

[7]For example, a sample part number for a DC-9 aircraft from LTD is P15589M1-3. The same part ordered from USA would be designated by the part number NAU15589M1-3. (LTD's Memo, p. 6).

10

readily distinguishes it from the numbers used by LTD. Second, LTD has failed to show bad intent by USA in its use of the part numbers. On the contrary, it seems to us that USA's attempt to add letter prefixes suggests that it made a *good faith* attempt to provide a distinguishing characteristic between the numbering systems subsequent to the termination of the parties' longstanding distributorship agreement. Finally, LTD has not provided any examples of actual confusion of consumers using USA's numbering system with the added letter prefix.

While none of these three factors are dispositive of the issue of likelihood of confusion, *Ely Lilly & Co.*, 233 F.3d at 462, taken together they convince us that LTD does not have a better than negligible chance of showing a likelihood of confusion where the product numbers include USA's added letter prefixes. As such, the remainder of this discussion of the requested preliminary injunction only relates to USA's use of *identical* product numbers.

### b. Balancing of the Harms

LTD will suffer irreparable harm if the preliminary injunction is not granted. *Kennel Club*, 846 F.2d at 1092 ("damages occasioned by trademark infringement are by their very nature irreparable") (internal citations omitted). Irreparable harm in the trademark context is often assumed because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Abbott Labs.*, 971 F.2d at 16. Here, we are convinced that USA's continued use of LTD's identical product designation system will cause the damage to reputation and loss of goodwill one would expect when there is a likelihood of confusion as to the source of a product.

Upon finding that there is no adequate remedy at law, we are obliged to balance the hardships that the moving party will suffer if relief is not granted against those that the non-moving party will suffer if relief is granted. *Ty, Inc.*, 237 F.3d at 895. Here, it is clear that this balancing test tips in LTD's favor. USA admits that most of its current inventory and computer systems have already been changed to incorporate identifying letter prefixes. (USA's Memo, p.

11

11). It is not clear to what extent this change includes every part sold by USA.[8] However, the pleadings are clear that, for the most part, USA has already undertaken to cease using LTD's identical designation system. It follows then that it would not be difficult for USA to take that extra step: to cease using LTD's identical designation system altogether and to distinguish (using its prefixes) every part it sells from those parts sold by LTD. USA's pleadings make no argument that such a change would entail significant pecuniary harm. To not make the change, on the other hand, could further damage LTD's interest in its protectible trademark.

Weighing all these factors and "sitting as would a chancellor in equity," *Abbott Labs.*, 971 F.2d at 11, a preliminary injunction is hereby issued enjoining USA from using a product designation system identical to LTD's system.[9] The continued use by USA of letter prefixes to distinguish its products from LTD's is not the subject of this injunction because LTD has not shown at this stage that such use creates a likelihood of confusion.

### 2. Use of the Domain Names

LTD also seeks a preliminary injunction preventing USA's use of the domain names "navaidsltd.com" and "nav-aidsltd.com." LTD argues that such use of the domain names violates Section 43(d) of the Lanham Act, also known as the Anticybersquatting Protection Act ("ACPA"). 15 U.S.C. § 1125(d). USA, however, argues that it lacks the bad faith intent required under the ACPA. As described above, a preliminary injunction will issue when (1) the moving party has demonstrated a better than negligible likelihood of success on the merits; (2) there is no adequate remedy at law; and (3) the moving party will suffer irreparable harm if the order is not granted.

---

[8] In particular, the pleadings mention the possibility that parts sold to the military by USA might still be identified with the product designation system *without* the letter prefixes.

[9] This grant of a preliminary injunction renders unnecessary an inquiry into LTD's parallel state law bases for a preliminary injunction based upon the CFDBPA and the UDTPA.

The court must then balance the hardships among the parties and weigh all the factors when deciding whether to grant the injunction.

### a. Likelihood Of Success

The ACPA provides for civil liability when a person, with a bad faith intent to profit from a protected mark, registers or uses a domain name that is identical or confusingly similar to the famous or distinctive mark. 15 U.S.C. §1125(d)(1)(A). The first inquiry, therefore, is whether the 'Nav-Aids Ltd.' mark is distinctive or famous. LTD argues that its name is distinctive and entitled to protection. (LTD Memo, p. 15). USA, in its response, does not dispute this contention. Accordingly, we have no reason to believe that LTD's mark is not distinctive for purposes of the ACPA. With this holding, we need not find that LTD's mark is famous for purposes of the ACPA; its distinctiveness satisfies that element of the statute. *Sporty's Farm, L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 497 (2nd Cir. 2000).

Next, we must inquire whether the domain name in question is identical or confusingly similar to the protected distinctive mark. *Id.* Here again there is little doubt. LTD's 'Nav-Aids Ltd.' mark is identical to USA's registered domain name "nav-aidsltd.com." Moreover, it is practically identical to USA's other registered domain name "navaidsltd.com." Once again, USA does not dispute this contention.

The parties do dispute, however, the final element of the ACPA analysis -- namely, the requirement that there be bad faith intent to profit from the mark. 15 U.S.C. §1125(d)(1)(A)(i). The statute lists nine non-exclusive factors to assist courts in determining when a person has acted with a bad faith intent to profit from the use of a mark.[10] We hold that there is a better than

---

[10]These factors are:
    (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
    (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
    (III) the person's prior use, if any, of the domain name in connection with the bona fide

13

negligible chance that LTD would succeed on a showing that USA had a bad faith intent to profit from the use of LTD's protected mark. First, there is no indication that USA has a trademark or other intellectual property right in the 'Nav-Aids Ltd' mark. On the contrary, exactly the opposite is true: LTD has a protectible interest in the mark. Also, we agree with LTD that there may be intent to divert consumers from LTD's online location (at "navaidsltd.net") to USA's location (at the .com address) by creating a likelihood of confusion as to the source or affiliation of the site. Supporting USA's argument, on the other hand, is the fact that USA has had a prior use of the domain name in connection with the bona fide offering of goods and services. There is one factor, however, that greatly weighs in LTD's favor – the domain name does not consist of the legal name of the party that registered it. 15. U.S.C. §1125(d)(1)(B)(ii)(II). Specifically, USA's domain name includes the letters 'ltd.' We can find no reason (and USA makes no attempt to offer a reason) why USA would include these letters in the domain name except in an attempt to steer

---

offering of any goods or services;
(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection(c)(1) of section 43.
15 U.S.C. § 1125(d)(1)(B)(i).

LTD's customer's to USA's site. 'Ltd' is not part of the corporate name of USA but is a part of the corporate name of LTD. Thus, we hold the LTD has a better than negligible chance of showing that LTD acted with bad faith under the ACPA. Accordingly, because it could satisfy both elements of the ACPA claim, LTD has shown that it has a better than negligible chance of succeeding on the merits of its claim. In fact, it seems to this court on the facts so far presented that LTD has a good chance of succeeding on the merits of its ACPA claim.

### b. Balancing of the Harms

We are convinced that LTD will suffer irreparable harm if the preliminary injunction is not granted. There is no quantifiable way to measure LTD's potential loss of customers and good will due to the fact that its protectible mark is being used by USA as a domain name. Also, absent an injunction there is nothing to prevent USA from continuing to use the domain name (or, at least, to keep LTD from using the domain name) pending a resolution of this case on the merits.

Upon finding that there is no adequate remedy at law, we are obliged to balance the hardships that the moving party will suffer if relief is not granted against those that the non-moving party will suffer if relief is granted. *Ty, Inc.*, 237 F.3d at 895. Here, it is clear that this balancing test tips in LTD's favor. USA makes no attempt to argue that it would be harmed by a injunction preventing their use of the domain names. Indeed, it is clear that USA would not be harmed. On the other hand, LTD stands to lose much in the way of customers and good faith. Similarly, the public interest tips in favor of LTD in this matter. Customers have an interest in avoiding confusion in the marketplace. *See Estate of Presley v. Russen*, 513 F.Supp 1339, 1382 (D. N.J. 1981)("[T]he public is interested in fair competitive practices and clearly opposed to being deceived in the marketplace").

Weighing all these factors and "sitting as would a chancellor in equity," *Abbott Labs.*, 971 F.2d at 11, a preliminary injunction is hereby issued enjoining USA's continued use of the "navaidsltd.com" and "nav-aidsltd.com" domain names. Furthermore, USA is enjoined from

15

auctioning, offering for sale, or in any way transferring such domain names. Finally, it is ordered that USA shall transfer the domain names to LTD pending a resolution on the merits.[11] *See Ford Motor Co. v. Lapertosa*, 126 F.Supp.2d 463, 468 (E.D. Mich., Jan. 3, 2001)(granting preliminary injunction against use of domain name and ordering the transfer of domain name until resolution of case on the merits).

## CONCLUSION

We therefore grant LTD's motion for summary judgment on Count I (breach of contract) and order USA to pay damages in the amount of $206,181.40, plus prejudgment interest (at the prime rate) from the due dates of the invoices. In addition, we grant LTD's motion for a preliminary injunction (1) preventing USA's continued use of an identical product designation system or otherwise misrepresenting in any way that products, goods, and services not approved or authorized by LTD are approved and authorized by LTD and (2) preventing USA's continued use of the "nav-aidsltd.com" and "navaidsltd.com" domain names and ordering USA to transfer said domain names to LTD pending resolution of this matter on the merits.

MARVIN E. ASPEN
United States District Judge

Dated: 10/24/01

---

[11] "In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C).